IN THE

# United States Court of Appeals for the Fourth Circuit

MOUNTAIN VALLEY PIPELINE, LLC,

Petitioner,

v.

NORTH CAROLINA DEPARTMENT OF ENVIRONMENTAL QUALITY;
MICHAEL S. REGAN, in his official capacity as Secretary of the North Carolina
Department of Environmental Quality; and S. DANIEL SMITH, in his official
capacity as Director, Division of Water Resources, of the North Carolina
Department of Environmental Quality,

Respondents,

HAW RIVER ASSEMBLY; SIERRA CLUB; APPALACHIAN VOICES; and
CENTER FOR BIOLOGICAL DIVERSITY,

Intervenor-Respondents.

On Petition for Review to the
North Carolina Department of Environmental Quality

## OPENING BRIEF FOR PETITIONER
## MOUNTAIN VALLEY PIPELINE, LLC

CATHERINE E. STETSON
SEAN MAROTTA
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5491
cate.stetson@hoganlovells.com

*Counsel for Mountain Valley Pipeline,
LLC*

November 16, 2020

## PETITIONER'S RULE 26.1 STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Mountain Valley Pipeline, LLC certifies that:

1. Mountain Valley Pipeline, LLC is **not** a publicly held corporation or other publicly held entity.

2. Mountain Valley Pipeline, LLC does **not** have any parent corporations.

3. The following publicly traded entities have indirect ownership interests in Mountain Valley Pipeline, LLC:

    a. Equitrans Midstream Corporation (NYSE: ETRN);

    b. NextEra Energy, Inc. (NYSE: NEE);

    c. AltaGas Ltd. (TSX: ALA); and

    d. RGC Resources, Inc. (NASDAQ: RGCO)

4. The entities listed in Question 3 are publicly held corporations or other publicly held entities that have a direct financial interest in the outcome of the litigation.

5. Mountain Valley Pipeline, LLC is **not** a trade association.

6. This case does **not** arise out of a bankruptcy proceeding.

7. This is **not** a criminal case in which there was an organizational victim.

# TABLE OF CONTENTS

Page

PETITIONER'S RULE 26.1 STATEMENT..............................................i

TABLE OF AUTHORITIES ...................................................... iii

INTRODUCTION ...............................................................1

JURISDICTIONAL STATEMENT ................................................3

ISSUES PRESENTED FOR REVIEW ...........................................4

STATEMENT OF THE CASE...................................................4

STANDARD OF REVIEW ......................................................18

SUMMARY OF ARGUMENT ..................................................19

ARGUMENT ..................................................................22

    I.    THE DEPARTMENT'S DENIAL OF MOUNTAIN
           VALLEY'S APPLICATION DID NOT COMPLY WITH ITS
           OWN REGULATIONS..................................................22

    II.   THE DEPARTMENT EXCEEDED ITS LIMITED
           JURISDICTION UNDER THE CLEAN WATER ACT........................30

    III.  THE DEPARTMENT DID NOT EXPLAIN ITS
           DISAGREEMENT WITH ITS HEARING OFFICER'S
           CONCLUSIONS, CONSIDER THE EVIDENCE SHOWING
           THE MAINLINE PROJECT WAS VIABLE, OR EXPLAIN
           WHY A CONDITIONALLY APPROVED PERMIT WOULD
           NOT ADDRESS ITS CONCERNS .......................................36

CONCLUSION ................................................................41

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

C<small>ASES</small>:

*AES Sparrow Point LNG, LLC v. Wilson*,
  589 F.3d 721 (4th Cir. 2009) ............................................................... 19

*Alvarez Lagos v. Barr*,
  927 F.3d 236 (4th Cir. 2019) ............................................................... 39

*American Rivers, Inc. v. FERC*,
  129 F.3d 99 (2d Cir. 1997) ................................................................. 32

*Appalachian Voices v. State Water Control Bd.*,
  912 F.3d 746 (4th Cir. 2019) ..................................................... 18, 19, 38

*Arc Bridges, Inc. v. NLRB*,
  861 F.3d 193 (D.C. Cir. 2017) ............................................................. 38

*Bluestone Energy Design, Inc. v. FERC*,
  74 F.3d 1288 (D.C. Cir. 1996) ............................................................. 26

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*,
  419 U.S. 281 (1974) .......................................................................... 36

*Chamber of Commerce v. NLRB*,
  721 F.3d 152 (4th Cir. 2013) ............................................................... 30

*City of Rockingham v. North Carolina Dep't of Env't & Nat. Res.*,
  736 S.E.2d 764 (N.C. Ct. App. 2012) ............................................... 28, 29

*Commonwealth Power Co. v. Department of Nat. Res.*,
  No. 204399, 2000 WL 33521869 (Mich. Ct. App. Mar. 21, 2000) ............... 33

*Employment Sec. Comm'n of North Carolina v. Peace*,
  493 S.E.2d 466 (N.C. Ct. App. 1997) ............................................... 12, 13

*Federal Defs. of New York, Inc. v. Federal Bureau of Prisons*,
  954 F.3d 118 (2d Cir. 2020) ............................................................... 25

*Fort Dearborn Co. v. NLRB*,
  827 F.3d 1067 (D.C. Cir. 2016) ........................................................... 38

*Fred Meyer Stores, Inc. v. NLRB*,
865 F.3d 630 (D.C. Cir. 2017)...........................................................39

*Illinois Pub. Telecomms. Ass'n v. FCC*,
117 F.3d 555 (D.C. Cir. 1997)...........................................................40

*Islander E. Pipeline Co. v. Connecticut Dep't of Envtl. Prot.*,
482 F.3d 79 (2d Cir. 2006) ................................................................36

*Islander E. Pipeline Co. v. McCarthy*,
525 F.3d 141 (2d Cir. 2008) ...............................................................8

*Judulang v. Holder*,
565 U.S. 42 (2011)..............................................................................36

*McCartey v. Massanari*,
298 F.3d 1072 (9th Cir. 2002) ...........................................................37

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)..............................................................................40

*National Envtl. Dev. Ass'n's Clean Air Project v. EPA*,
752 F.3d 999 (D.C. Cir. 2014)...........................................................30

*Natural Res. Def. Council Inc. v. U.S. EPA*,
16 F.3d 1395 (4th Cir. 1993) ...............................................................7

*Niagara Mohawk Power Corp. v. New York State Dep't of Envtl.
Conservation*,
624 N.E.2d 146 (N.Y. 1993)..............................................................31

*North Carolina v. EPA*,
531 F.3d 896 (D.C. Cir. 2008)...........................................................26

*Ohio River Valley Envtl. Coal., Inc. v. Kempthorne*,
473 F.3d 94 (4th Cir. 2006) ...............................................................26

*Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*,
556 F.3d 177 (4th Cir. 2009) .............................................................38

*Piney Run Pres. Ass'n v. County Comm'rs of Carroll Cty.*,
   268 F.3d 255 (4th Cir. 2001) ................................................................7

*PUD No. 1 of Jefferson Cty. v. Washington Dep't of Ecology*,
   511 U.S. 700 (1994)...................................................................32, 34

*Roe v. U.S. Dep't of Defense*,
   947 F.3d 207 (4th Cir. 2020) .............................................................36

*Schneidewind v. ANR Pipeline Co.*,
   485 U.S. 293 (1988)..........................................................................5

*S.D. Warren Co. v. Maine Bd. of Envtl. Prot.*,
   547 U.S. 370 (2006).........................................................................31

*Sierra Club v. State Water Control Bd.*,
   898 F.3d 383 (4th Cir. 2018) .............................................................19

*Sierra Club v. U.S. Army Corps of Eng'rs*,
   905 F.3d 285 (4th Cir. 2018) .............................................................11

*Sierra Club, Inc. v. U.S. Forest Serv.*,
   897 F.3d 582 (4th Cir. 2018) .............................................................11

*Summit Hydropower v. Commissioner of Envtl. Prot.*,
   No. CV91050 26 43, 1992 WL 175241 (Conn. Super. Ct. July 20,
   1992) ...............................................................................................33

*United States v. Heffner*,
   420 F.2d 809 (4th Cir. 1969) .............................................................25

*United States v. Morgan*,
   193 F.3d 252 (4th Cir. 1999) .............................................................25

*United States Sugar Corp. v. EPA*,
   830 F.3d 579 (D.C. Cir. 2016).......................................................40, 41

*Woods v. Berryhill*,
   888 F.3d 686 (4th Cir. 2018) .............................................................37

**ADMINISTRATIVE PROCEEDING:**

*Mountain Valley Pipeline, LLC*,
    173 FERC ¶ 61,027 (Oct. 9, 2020) ............................................................17, 18

**STATUTES:**

5 U.S.C. § 706(2) ................................................................................19

15 U.S.C. § 717b(d) ..............................................................................6

15 U.S.C. § 717f ...................................................................................3

15 U.S.C. § 717f(e) ............................................................................5, 6

15 U.S.C. § 717n(b)(1) ....................................................................5, 6, 31

15 U.S.C. § 717r(d)(1) ..........................................................................3

15 U.S.C. § 717r(d)(3) ........................................................................18

33 U.S.C. § 1313(c)(2)(A) .....................................................................7

33 U.S.C. § 1341 ...................................................................................1

33 U.S.C. § 1341(a)(1) .....................................................................7, 31

33 U.S.C. § 1341(d) ............................................................................31

42 U.S.C. § 4321 *et seq.* .......................................................................5

42 U.S.C. § 4332(2)(C) ..........................................................................6

N.C. Gen. Stat. § 143-211(c) ................................................................7

N.C. Gen. Stat. § 143-215.3(c) .............................................................7

N.C. Gen. Stat. § 150B-51(b) .............................................................19

REGULATIONS:

18 C.F.R. § 157.21 ......................................................................8

18 C.F.R. § 380.12 ......................................................................6

40 C.F.R. § 131.4(a) ...................................................................7

15A NCAC 2B.0100-.0300 .........................................................7

15A NCAC 2B.0201 ....................................................................7

15A NCAC 2B.0211 ....................................................................7

15A NCAC 2B.0212 ....................................................................7

15A NCAC 2B.0219 ....................................................................7

15A NCAC 2H.0506 ......................................................8, 15, 19

15A NCAC 2H.0506(b) .......................................................passim

15A NCAC 2H.0506(b)(1) .............................................8, 22, 28

15A NCAC 2H.0506(b)(2) .............................................8, 22, 27

15A NCAC 2H.0506(b)(3) .................................................23, 27

15A NCAC 2H.0506(b)(4) .......................................................23

15A NCAC 2H.0506(b)(5) .......................................................23

15A NCAC 2H.0506(b)(6) .......................................................23

OTHER AUTHORITY:

EPA, *Subchapter 2B – Surface Water and Wetland Standards Sections
.0100 - .0300* (eff. Apr. 9, 2020), https://tinyurl.com/y3zx47y7 ..........................7

## INTRODUCTION

Petitioner Mountain Valley Pipeline, LLC is the sponsor of the Southgate Project, a new pipeline project that will carry natural gas from the terminus of Mountain Valley's Mainline Project in Virginia to delivery points in North Carolina. The Federal Energy Regulatory Commission (FERC), which approves interstate natural gas pipelines, found the Project to be in the public convenience and necessity, concluding that—appropriately conditioned—the project's public benefits outweighed any potential or temporary environmental impacts.

Under Section 401 of the Clean Water Act, 33 U.S.C. § 1341, state agencies like the North Carolina Department of Environmental Quality (Department) have the authority to review natural-gas projects like the Southgate Project to ensure they will not violate applicable state water-quality standards. And when Mountain Valley submitted a Section 401 water quality certification application for the Southgate Project to the Department, a Department hearing officer diligently confirmed that the Project, as proposed and as conditioned, would not violate any applicable North Carolina water-quality standard.

That should have been the end of it. Under the Department's regulations, it "shall" issue a Section 401 certification to any project that will not violate the State's standards.

The Department nonetheless denied Mountain Valley's application. And it did so without citing a single state water-quality standard that the Southgate Project, as proposed, would not comply with. The Department instead speculated that Mountain Valley's separate Mainline Project might not be completed because it was under a temporary stop-work order—since partially lifted—while it awaited a few remaining federal permits to be finalized. According to the Department, the Southgate Project depends on a completed Mainline Project such that without certainty that the Mainline Project would be finished, it would be inappropriate to grant the Southgate Project a Section 401 certification.

But the Department's limited charge under Section 401 and its own regulations is to decide only whether the Southgate Project will violate the State's detailed water-quality standards, not whether—in the Department's subjective view—the Project will meet its goals. In denying Mountain Valley's certification application on generalized policy grounds, the Department violated the statutes and rules governing its review, which is textbook arbitrary and capricious agency action.

The Department's denial is arbitrary and capricious for another reason as well: It failed to explain the choices that it made or justify its actions. The Department's own hearing officer found that the Southgate Project would comply with all applicable water-quality standards. The Department failed to even

acknowledge those findings, much less voice any disagreement. The Department also failed to explain why it disagreed with Mountain Valley's evidence demonstrating that the Mainline Project was viable. And even though the Department's hearing officer suggested approval of Mountain Valley's application conditioned on the Mainline Project receiving all necessary authorizations—the same approach FERC took in granting the Southgate Project a certificate of convenience and public necessity—the Department did not acknowledge that option, much less explain why it chose denial instead. Reasoned decisionmaking requires more than what the Department gave.

The Department's denial is contrary to law and should be vacated.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 15 U.S.C. § 717r(d)(1), which states that "[t]he United States Court of Appeals for the circuit in which a facility subject to" regulation under 15 U.S.C. § 717f "is proposed to be constructed . . . shall have original and exclusive jurisdiction over any civil action for the review of an order or action of a . . . State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit." The proposed facilities here are in the Fourth Circuit, stretching from Virginia to North Carolina. JA__ [2019 Joint Permit Application at 2-3]. The facilities are subject to regulation under Section 717f. *See* JA__ [*Id.* at 1-1]. And Mountain Valley challenges the Department's

refusal to certify its proposed facilities under Section 401 of the Clean Water Act. JA__-__ [Denial Letter]. This Court accordingly has jurisdiction.

## ISSUES PRESENTED FOR REVIEW

1. Whether the Department acted arbitrarily and capriciously by basing its denial of Mountain Valley's Section 401 certification application on its subjective view of whether Mountain Valley's Mainline Project would be completed—a criterion found nowhere in the Department's water-quality-certification regulations.

2. Whether the Department exceeded its statutory authority under Section 401 by denying a certification for Mountain Valley's Southgate project on grounds unrelated to water quality.

3. Whether the Department acted arbitrarily and capriciously in rejecting its own hearing officer's recommendation to grant a conditioned Section 401 certification for Mountain Valley's Southgate project without explaining its reasons for doing so and by speculating that the Mainline Project will not be built without explaining why it disagreed with Mountain Valley's contrary evidence.

## STATEMENT OF THE CASE

**Statutory and Regulatory Background.** Mountain Valley's Southgate Project is a natural gas pipeline project designed to address the Southeast's growing energy needs. JA__-__ [2019 Joint Permit Application at 1-1]. The

Southgate Project will connect with Mountain Valley's separate Mainline Project in Virginia to transport natural gas across approximately 75 miles from Pittsylvania County, Virginia to Alamance and Rockingham counties, North Carolina. *Id.* Once completed, the Southgate Project will provide timely, cost-effective natural-gas supply to North Carolina and southern Virginia. *Id.*

The Southgate Project requires approvals from both federal and state agencies. Chief among these is a certificate of public convenience and necessity from FERC, the agency with "exclusive jurisdiction over the transportation and sale of natural gas in interstate commerce for resale." *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 300-301 (1988). As its name suggests, a certificate of convenience and public necessity represents FERC's considered judgment that the proposed project "is or will be required by the present or future public convenience and necessity." 15 U.S.C. § 717f(e).

In considering whether to grant a certificate of public convenience and necessity, FERC considers the need for and viability of the project, requiring an applicant to show "evidence of public benefits to be achieved" by the project. JA__-__ [FERC Order P 24]. FERC also considers the environmental impacts of any proposed project. The Commission must comply with the environmental review requirements of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*; 15 U.S.C. § 717n(b)(1), which often includes preparing a

comprehensive Environmental Impact Statement (EIS).  Among other things, the EIS must describe "the environmental impact of the proposed action," address "any adverse environmental effects which cannot be avoided," and identify "alternatives to the proposed action."  42 U.S.C. § 4332(2)(C).  To enable FERC to fulfill NEPA's requirements, certificate applicants must submit comprehensive environmental resource reports on subjects like water quality and potential alternatives to the proposed project.  *See* 18 C.F.R. § 380.12.

FERC will issue a certificate of public convenience and necessity only if the public benefits from the project outweigh its adverse effects.  15 U.S.C. § 717f(e).  And FERC may "attach to the issuance of the certificate . . . such reasonable terms and conditions as the public convenience and necessity may require."  *Id.*

Given the Commission's primacy in approving interstate natural gas pipelines, Congress gave FERC the job of coordinating all other required federal authorizations for a new natural-gas project.  15 U.S.C. § 717n(b)(1).  But the Natural Gas Act preserves States' authority to issue water-quality certifications under Section 401 of the Clean Water Act.  *See id.* § 717b(d).

Section 401 requires an "applicant for a Federal license or permit to conduct any activity . . . which may result in any discharge into the navigable waters" to obtain a certification from the State where the construction is to occur that the project will comply with the Clean Water Act's substantive requirements and

appropriate provisions of state law.  33 U.S.C. § 1341(a)(1).  States accordingly

may develop water-quality standards for waters within their jurisdictions.  *Piney*

*Run Pres. Ass'n v. County Comm'rs of Carroll Cty.*, 268 F.3d 255, 266 n.9 (4th

Cir. 2001); *see also* 40 C.F.R. § 131.4(a).  Water quality standards primarily

consist of three elements: (1) a State's "designated uses" for each of its navigable

waterbodies—for example, fishing, swimming, public water supply; (2) a State's

"water quality criteria"—for example, maximum pollutant levels—that must be

attained for a waterbody to fulfill those designated uses; and (3) a State's

antidegradation policy to protect existing water quality.  *Natural Res. Def. Council*

*Inc. v. U.S. EPA*, 16 F.3d 1395, 1400 (4th Cir. 1993) (citing 33 U.S.C.

§ 1313(c)(2)(A)).

North Carolina tasks the Department with regulating "water and air pollution

control and water resource management," N.C. Gen. Stat. § 143-211(c), and

reviewing Section 401 certification applications, *id.* § 143-215.3(c).  The

Department has used its authority to issue water-quality standards.  *See, e.g.*, 15A

NCAC 2B.0100-.0300.  It has, for instance, adopted an antidegradation policy.  *Id.*

at 2B.0201.  The Department has also established the maximum level of pollutants

for various classes of water.  *See, e.g.*, *id.* at 2B.0211, .0212, .0219; *see also* EPA,

*Subchapter 2B – Surface Water and Wetland Standards Sections .0100 - .0300* (eff.

Apr. 9, 2020), https://tinyurl.com/y3zx47y7.  And through the Clean Water Act's

system of cooperative federalism, North Carolina's water-quality standards are incorporated into federal law. *Islander E. Pipeline Co. v. McCarthy*, 525 F.3d 141, 143 (2d Cir. 2008) ("[S]tate standards approved by the federal government become the federal standard for that state.")

The Department has also promulgated rules for reviewing certification applications. 15A NCAC 2H.0506. As of June 15, 2020, "[t]he [Department] *shall issue* an individual certification or a 'Certificate of Coverage' under a general certification *upon determining* that the proposed activity will comply with state water quality standards." *Id.* at 2H.0506(b) (emphases added). In making its certification decision, the Department must consider certain enumerated criteria— for example, whether the proposed activity "has avoided and minimized impacts to surface waters and wetlands" and whether proposed activity "would cause or contribute to a violation of water quality standards." *Id.* at 2H.0506(b)(1)-(2).

**FERC Review of the Southgate Project.** In May 2018, Mountain Valley began FERC's pre-filing process to seek authorization for the Southgate Project. JA__ [FEIS at ES-2]; *see also* 18 C.F.R. § 157.21 (describing the pre-filing process). FERC in response issued a draft notice of intent to prepare an EIS, soliciting comments on the EIS's scope. JA__ [FEIS at ES-2]. The Department responded to FERC's notice of intent, identifying areas it believed FERC needed to consider more fully. *See* JA__-__ [NCDEQ 2018 Comment Letter].

Mountain Valley then filed an application seeking certificate authorization for the Southgate Project, which FERC granted in June 2020. JA__ [FERC Order PP 1-2]. In evaluating Mountain Valley's application, FERC comprehensively evaluated the Southgate Project's public benefits and potential adverse impacts. The Commission considered the Project's effect on landowners and communities, as well as its impact on existing customers. JA__-__ [*Id.* PP 25, 27]. FERC also evaluated the public need for the Project, concluding that there was market demand for the capacity it would add and that no other pipeline could adequately service it. *See* JA__-__ [*Id.* PP 31-45].

FERC also prepared an EIS to comprehensively evaluate the Project's potential adverse impacts. *See* JA__ [FEIS at ES-1]; JA__ [FERC Order P 72]. In July 2019, FERC issued a draft EIS, addressing concerns raised in response to the notice of intent. JA__-__ [Draft EIS at 1-8 to 1-11]. The Department commented on the draft. *See* JA__-__ [NCDEQ 2019 Comment Letter]. None of the Department's comments suggested that the Southgate Project certainly would not comply with North Carolina's water-quality standards. *Id.* Instead, the Department questioned the need for the Southgate Project, FERC's consideration of non-natural gas alternatives, and FERC's alleged failure to consider environmental-justice issues. JA __ - __ [*Id.* at 2-10]. While the letter vaguely mentioned water impacts, the primary environmental concern the Department

9

raised was to question whether FERC had sufficiently considered the Southgate Project's impact on greenhouse gases and climate change. JA__-__, __-__ [*Id.* at 5-6, 12-16].

FERC responded to each the Department's comments in its final EIS. JA__-__ [FEIS Appendix I.3-36 to -49]. The final EIS also included an extensive consideration of the Southgate Project's construction procedures, JA__-__ [FEIS at 2-12 to 2-29], as well as a thorough review of the Southgate Project's impacts on water resources in Virginia and North Carolina. *See, e.g.*, __-__ [*Id.* at 4-41 to 4-43]. Ultimately, the FEIS concluded that with the implementation of avoidance, minimization, and mitigation measures proposed by Mountain Valley and FERC, the Southgate Project would not have significant adverse environmental impacts. JA__ [*Id.* at ES-10].

FERC also understood that the question whether the Project's demonstrated public benefits outweighed its potential adverse impacts turned, in part, on whether the Mainline Project would be completed. *See* JA__, __-__ [FERC Order PP 25, 42]. FERC explained that the Southgate Project was an extension of the Mainline Project, JA__ [*Id.* P 59], with "[t]he design of the Southgate Project allow[ing] only for the physical flow of gas from" the Mainline Project "to the Southgate Project facilities." JA__ [*Id.* P 25]. FERC also explained that, in 2018, this Court vacated certain federal authorizations for the Mainline Project pending further

review by the responsible agencies.  JA__-__ [*Id.* PP 4-5] (discussing *Sierra Club, Inc. v. U.S. Forest Serv.*, 897 F.3d 582 (4th Cir. 2018) and *Sierra Club v. U.S. Army Corps of Eng'rs*, 905 F.3d 285 (4th Cir. 2018) (per curiam)).  In response to those decisions, FERC issued a stop-work order for the Mainline Project.  JA__ [*Id.* P 4].

FERC's certificate for the Southgate Project took all of this into account. FERC directed that construction on the Southgate Project could not even begin until the Mainline Project received all required federal authorizations and FERC allowed construction to resume.  JA__-__ [*Id.* PP 8-9].  This conditional authorization ensured that the Southgate Project's potential environmental impacts would not occur unless and until the Mainline Project moved forward.  *See id.*

**The Department's Review of the Southgate Project.**  Like almost all pipeline projects, the Southgate Project's construction may result in discharges regulated by the Clean Water Act.  Mountain Valley therefore in November 2018 submitted a Section 401 certification application for the Southgate Project to the Department.  JA__-__ [2018 Joint Permit Application].  The Department initially denied the application, concluding that because Mountain Valley was still evaluating the Project's route and FERC had not yet completed its draft EIS, the Department did not have sufficient information to determine whether the Project would violate North Carolina water standards.  JA__-__ [NCDEQ March 25, 2019

Letter].  But the Department invited Mountain Valley to reapply after FERC had completed the draft EIS and identified a preferred route.  JA__ [*Id.* at 2].

Mountain Valley did so in August 2019.  JA__-__ [2019 Joint Permit Application].  Mountain Valley's initial plan identified temporary impacts to several streams and open waters during the construction phase.  JA__ [R&R 2].  Mountain Valley also anticipated that construction would temporarily impact approximately 13.95 acres of wetlands and permanently impact .02 acres of wetlands.  *Id.*  Finally, Mountain Valley anticipated impacts to approximately 357,000 square feet and 270,000 square feet, respectively, in two zones of the Jordan Lake Watershed's protected riparian buffers.  *Id.*

The Department made numerous requests for additional information from Mountain Valley about the Southgate Project, and Mountain Valley's application was open for public comment from October to December 2019.  JA__-__ [*Id.* at 2-3].  In response to those requests and comments, Mountain Valley refined the Southgate Project, proposing a 20% reduction in stream impacts, a 12% reduction to wetlands impacts, and a 50% and 20% reduction in impacts, respectively, to the two protected riparian buffer zones.  *Id.*  The Department also held a public hearing in November 2019 on Mountain Valley's application, where a hearing officer—who is independent so as to "prevent the commingling of legislative, executive, and judicial functions in the administrative process," *Employment Sec.*

*Comm'n of North Carolina v. Peace*, 493 S.E.2d 466, 471 (N.C. Ct. App. 1997) (citation omitted)—received oral and written comments on the Project. JA__ [R&R 1].

In June 2020, the Department requested additional information regarding the Mainline Project, noting that it had "received numerous comments expressing concern over the potential construction of the . . . Southgate Project when [the Mainline Project] is currently under a stop work order and multiple legal delays/complications." JA__ [June 2020 RAI Response 2]. In response, Mountain Valley explained that the Mainline Project was "unrelated to, and outside the narrow scope of the Division's Section 401 regulatory review," since the Department lacks the "statutory authority to base a water quality certification decision on factors, such as the information requested . . . , that have no bearing on discharges or water quality in North Carolina." JA__-__ [*Id.* at 28-29].

But in all events, Mountain Valley explained, FERC had issued a certificate of convenience and public necessity for the Southgate Project conditioned on the Mainline Project receiving all necessary authorizations and the Mainline Project's stop-work order being lifted. JA__-__ [*Id.* at 3-4]. Mountain Valley also provided the Department with a chart listing the status of all required Southgate and Mainline Project authorizations, showing that those authorizations were in progress. JA__-__ [*Id.* at 4-10]. Based on those in-progress authorizations,

Mountain Valley represented that it "fully expects to resolve all Mainline permitting issues in a timeframe that is not expected to materially delay the planned commencement of construction for" the Southgate Project. JA__ [*Id.* at 3].

The hearing officer issued his report in August 2020. JA__-__ [R&R]. He determined that Mountain Valley had minimized impacts to surface waters and wetlands to the greatest extent practical. JA__-__ [*Id.* at 12-13]. He noted that there were no permanent impacts to streams and wetlands contemplated in the application, and that Mountain Valley had committed to several best-management practices to avoid and minimize even temporary impacts to streams and wetlands. *Id.* The hearing officer therefore found that if the Southgate Project was built and operated as planned and in accordance with his recommended environmental conditions, "the streams, buffers, and wetland impact areas" around the Project "will continue to support existing uses of hydrology, vegetation, and aquatic and wildlife habitat." JA__ [*Id.* at 13].

The hearing officer reached a similar conclusion about the Southgate Project's potential degradation of groundwaters and surface waters. JA__-__ [*Id.* at 14-16]. While recognizing some risks to surface and groundwater during construction activities, the hearing officer found that Mountain Valley had committed to appropriate mitigation measures to avoid them. JA__-__ [*Id.* at 14-

15].  And the Southgate Project was not expected to have permanent adverse effects on streams, open waters, or wetlands.  JA__, __ [*Id.* at 2, 15].  The hearing officer accordingly found that "[t]he project is not expected to violate water quality standards if the certification is issued and if the conditions in the 401 Water Quality Certification are fully complied with by the applicant."  JA__ [*Id.* at 16].

That should have been the end of it.  It was not.  The hearing officer then went beyond his assigned task, purporting to consider whether there were practical alternatives to the Southgate Project.  JA__-__ [*Id.* at 10-12].  The hearing officer engaged in that review even though FERC had already conducted an alternatives analysis, Section 401 does not require or allow States to conduct alternative analyses, and the Department itself had months earlier amended its regulations to *remove* an alternatives-analysis requirement, 15A NCAC 2H.0506 (eff. June 14, 2020).

The hearing officer recognized that FERC had considered several alternatives to meet the Project's purpose and public need, and had determined that the Project was best among them.  JA__ [R&R 10].  But instead of evaluating whether there were other, better ways to achieve the Southgate Project's purpose, he considered whether that purpose could be achieved at all.  JA__-__ [*Id.* 10-12].  According to the hearing officer, "a level of certainty regarding the completion of the [Mainline Project] is required" before greenlighting the Southgate Project

because its utility depends on a completed Mainline Project.  JA__-__ [*Id.* 11-12].

Citing only that the Mainline Project was then "under a stop work order and

multiple lawsuits"—without evaluating the circumstances further, or explaining

why further consideration was not necessary—the hearing officer asserted that

there was enough uncertainty about the Mainline Project that he could not

recommend certifying the Southgate Project outright.  *Id.*

The hearing officer accordingly offered two alternative recommendations.

JA__ [*Id.* at 12]; *see* JA__ [*id.* at 23].  First, mirroring FERC's approach, he

recommended that the Southgate Project's Section 401 certification be conditioned

on the Mainline Project receiving all necessary permits and having all stop-work

orders lifted.  JA__, __ [*Id.* at 12, 23]; *see also* JA__ [*id.* at 22] (recommending

that the "401 Water Quality Certification . . . be issued and subject to [certain]

conditions").  Alternatively, and without explanation, he proposed that the Section

401 application could be denied.  JA__, __ [*Id.* at 12, 23].

The Department chose option two.  Acting through the director of its water-

resources division, the Department denied Mountain Valley's application the same

day the hearing officer issued his report.  JA__-__ [Denial Letter].

The Department did not dispute in any respect the hearing officer's

conclusion that the Project would comply with the Department's water-quality

standards.  It agreed with the hearing officer's speculation that there was too much

uncertainty about whether the Mainline Project would be built.  JA__ [*Id.* at 2].

Citing the Mainline Project's current status, the Department concluded that it was

"inappropriate" to certify the Southgate Project "without further confidence that it

can achieve its stated purpose" of connecting to the Mainline Project.  *Id.*  The

Department stated that approving Southgate Project construction activities without

more certainty about the Mainline Project's viability was "inconsistent with

principles of minimization."  *Id.*  But the Department did not identify any North

Carolina water quality standard with which the Southgate Project, as proposed,

would not comply.  JA__-__ [*Id.* at 1-2].  Nor did the Department explain why its

concerns could not be addressed by conditioning the Southgate Project's

certification on the Mainline Project receiving all necessary authorizations and

being permitted to resume construction, just as FERC had done.  Instead,

questioning whether the Southgate Project's purpose was "unachievable," the

Department denied the permit altogether.  *Id.*  The Department never responded to

Mountain Valley's objection that considering the Mainline Project's status was not

permitted by the Department's regulations or Section 401.

Following the Department's denial, FERC partially lifted the Mainline

Project's stop-work order, and federal agencies re-issued many of the Mainline

Project permits.  *Mountain Valley Pipeline, LLC*, 173 FERC ¶ 61,027, at PP 1, 6-7

(Oct. 9, 2020).  The Fish and Wildlife Service revised and re-issued its Biological

Opinion and Incidental Take Statement for the Mainline Project, concluding that the Mainline Project will not jeopardize any listed species' continued existence and that it will not adversely impact critical habitats. *Id.* P 6. And the Army Corps of Engineers' Huntington, Norfolk, and Pittsburgh Districts all reaffirmed or reissued coverage under nationwide dredge-and-fill permits for the Project. *Id.* P 7. This Court later stayed the Mainline Project's coverage under the nationwide permits pending appeal. *See Sierra Club v. U.S. Army Corps of Eng'rs*, No. 20-2039 (4th Cir. Nov. 9, 2020). But the Court's stay does not prohibit Mountain Valley from receiving individual permits for the Mainline Project and does not prohibit the Mainline Project from undertaking activities that do not rely on the Corps' dredge-and-fill authorizations.

Mountain Valley's petition for review followed.

## STANDARD OF REVIEW

This Court reviews the Department's denial to determine if it is "inconsistent with the Federal law governing" Section 401 certifications. 15 U.S.C. § 717r(d)(3). Put to practice, Section 717r(d)(3) directs the Court to consider the Department's denial under the Administrative Procedure Act's familiar arbitrary-and-capricious standard. *Appalachian Voices v. State Water Control Bd.*, 912 F.3d

746, 753 (4th Cir. 2019); *AES Sparrow Point LNG, LLC v. Wilson*, 589 F.3d 721, 727 (4th Cir. 2009).[1]

## SUMMARY OF ARGUMENT

I.     The Department's denial of Mountain Valley's Section 401 application is arbitrary and capricious because it is contrary to the Department's own regulations.  The Department's Section 401 certification regulations, codified at 15A NCAC 2H.0506, state that the Department "shall issue" a certification if it determines "that the proposed activity will comply with state water quality standards."  *Id.* at 2H.0506(b).  The regulations then detail six—and only six— criteria for the Department to consider when determining whether a project will comply with North Carolina's water-quality standards.  The Department's hearing officer made uncontradicted findings that the Southgate Project will meet all the relevant criteria.  The Department's regulations—as well as fundamental administrative-law principles—therefore compelled it to grant the certification.

The Department's denial was based on a criterion found nowhere in its regulations: its unfounded doubts about the Mainline Project's viability.  It is

---

[1] The Court has questioned whether state-law judicial-review standards might be more appropriate.  *See Appalachian Voices*, 912 F.3d at 753 n.1; *Sierra Club v. State Water Control Bd.*, 898 F.3d 383, 403 n.13 (4th Cir. 2018).  But the Court need not answer that question here; North Carolina's standards for review of state-agency actions are materially identical to the APA's.  *Compare* N.C. Gen. Stat. § 150B-51(b), *with* 5 U.S.C. § 706(2).

black-letter law that an agency acts arbitrarily and capriciously where it disobeys its own regulations or relies on a factor it was not directed to consider.

II.     For similar reasons, the Department's denial of Mountain Valley's application exceeds its statutory authority under Section 401 of the Clean Water Act.  Under the Act, the Department's authority is limited to determining whether a project complies with the State's water-quality standards, not whether the project meets the State's broader policy preferences.  In this case, FERC—not the Department—decides whether the Mainline Project is viable and whether the Southgate Project should proceed.  The Department overstepped its assigned role by denying Mountain Valley's application based on its speculation whether the Mainline Project would be completed.

III.     Finally, even if the Department's decision complied with its own regulatory and Section 401's statutory frameworks, the denial was not the product of reasoned decisionmaking.  The Department's own hearing officer—in a report and recommendation released the same day as the Department's denial letter— concluded that the Southgate Project satisfied North Carolina's water-quality standards if built as planned and in accordance with the conditions proposed for its Section 401 certification.  Yet the Department did not even acknowledge the hearing officer's conditional-approval recommendation or explain why it apparently disagreed with it.  That was arbitrary and capricious.  The Department

need not always agree with its hearing officers, but it must explain why it came to a different conclusion and show that its decision was based on the record. It did not.

The Department also did not address Mountain Valley's extensive evidence that the Mainline Project was viable and will be completed in time to allow the Southgate Project to achieve its goals. In response to the Department's request for additional information, Mountain Valley provided a detailed status on the Mainline Project's pending permits and explained that the stop-work order would soon be lifted, as it ended up being in part. Yet the Department did not acknowledge this information or explain why it disagreed with Mountain Valley's representations.

The Department also did not explain why it chose to deny Mountain Valley's application as opposed to granting the Southgate Project a Section 401 certification conditioned on the Mainline Project receiving all necessary permits and FERC allowing construction to resume—just as FERC had done. The Department must explain why it exercised its discretion to deny rather than condition; here it never even acknowledged it made a choice, much less why it picked the alternative it did. And the Department's failure to even consider a conditioned approval is inexplicable given that FERC chose to condition the Southgate Project's certificate of convenience and public necessity in this way and

the Department's own hearing officer proposed a conditioned approval as a way to address concerns about the Mainline Project's viability.

The Court should vacate the Department's denial.

## ARGUMENT

I. **THE DEPARTMENT'S DENIAL OF MOUNTAIN VALLEY'S APPLICATION DID NOT COMPLY WITH ITS OWN REGULATIONS.**

Under the Department's Section 401-certification regulations, the Department "*shall issue*" a certification "upon determining that the proposed activity will comply with state water quality standards, which includes designated uses, numeric criteria, narrative criteria, and the state's antidegradation policy." 15A NCAC 2H.0506(b) (emphasis added). "In assessing whether the proposed activity will comply with water quality standards," the Department "shall evaluate if the proposed activity" has met six specified criteria. *Id.* They are:

- whether the proposed activity "has avoided and minimized impacts to surface waters and wetlands to ensure any remaining surface waters or wetlands, and any surface waters or wetlands downstream, continue to support existing uses during and after project completion." *Id.* at 2H.0506(b)(1).

- whether the proposed activity "would cause or contribute to a violation of water quality standards." *Id.* at 2H.0506(b)(2).

- whether the proposed activity "would result in secondary or cumulative impacts that cause or contribute to, or will cause or contribute to, a violation of water quality standards." *Id.* at 2H.0506(b)(3).

- whether the proposed activity "provides for replacement of existing uses through compensatory mitigation." *Id.* at 2H.0506(b)(4).

- whether, for projects that impact certain saltwater wetlands, the activity "is water dependent and requires access to water as a central element of its basic function." *Id.* at 2H.0506(b)(5).

- whether, for projects that impact certain wetlands of exceptional state or national ecological significance or that are habitats for "state or federally listed threatened or endangered species," the activity "is necessary to meet a demonstrated public need." *Id.* at 2H.0506(b)(6).

Taken together, the limits on the Department's authority are clear. The Department has confined itself to determining whether the proposed activity complies with North Carolina's water-quality standards. *Id.* at 2H.0506(b). To make that determination, the Department looks at six—and only six—criteria. *Id.* These six criteria are a closed set; if the Department finds that a project satisfies them, it has no further discretion—it "shall issue" the certification. *Id.*

The Department's hearing officer confirmed that the Southgate Project met these six criteria. JA__-__ [R&R]. The hearing officer noted that Mountain

Valley "has minimized impacts to surface waters and wetlands to the greatest extent practical," and "[u]pon successful completion of the restoration and monitoring activities, the streams, buffers, and wetland impact areas will continue to support existing uses."  JA__-__ [*Id.* at 12-13].  The hearing officer explained that "[t]he project is not expected to violate water quality standards" or "result in cumulative impacts that violate water quality standards" if the certification is issued with the conditions that Mountain Valley had agreed to.  JA__-__ [*Id.* at 16-17].  And the hearing officer did not identify any saltwater wetlands, unique wetlands, or habitats for threatened or endangered species that Southgate would need to meet special requirements to build near.  JA__-__ [R&R].

In short, the hearing officer found that the Southgate Project will comply with North Carolina's water-quality standards.  And because the Southgate Project would comply with North Carolina's water-quality standards, the Department's regulations required that it "shall issue" the Southgate Project's requested Section 401 certification.  15A NCAC 2H.0506(b).

The Department, however, followed its hearing officer down an irrelevant path.  Like the hearing officer, the Department speculated about the Mainline Project's viability, stating that "[w]ithout a complete and in-service" Mainline Project, the Southgate Project's goals were "unachievable."  JA__-__ [Denial Letter 1-2].  Like the hearing officer, the Department concluded that there was

significant uncertainty around the Mainline Project without sufficiently considering the Mainline Project's attendant circumstances. *Id.* And without even considering the hearing officer's conditional-approval recommendation, the Department denied Mountain Valley's application because "without further confidence that [the Southgate Project] can achieve its stated purpose, [certification] is inappropriate." JA__ [*Id.* at 2].

Yet nothing in the Department's Section 401 regulations tell it to consider whether a project's goals are "achievable." Its evaluation is narrow and technical. If the project meets North Carolina's water-quality standards, it is certified. If it does not, it is not. Whether the project can fulfill its purpose and need is a consideration the Department is not authorized to evaluate. The hearing officer recognized as much in addressing public comments questioning the purpose and need for the Southgate Project. He explained that "any remedy for [such] comments is outside the evaluation criteria established in [the] N.C. Administrative Code for the review of 401 Water Quality Certifications." JA__ [R&R 5].

The Department's freelancing violates two related rules of administrative procedure. First, an agency must follow its own regulations. *United States v. Morgan*, 193 F.3d 252, 267 (4th Cir. 1999) (citing *United States v. Heffner*, 420 F.2d 809, 811 (4th Cir. 1969)); *see also Federal Defs. of New York, Inc. v. Federal Bureau of Prisons*, 954 F.3d 118, 130 (2d Cir. 2020). The Department's refusal to

certify Mountain Valley's water-quality-standard compliant Southgate Project violates the Department's own regulations, and it should therefore be set aside.

Similarly, an agency's actions are arbitrary and capricious when they are based on impermissible considerations. *See Ohio River Valley Envtl. Coal., Inc. v. Kempthorne*, 473 F.3d 94, 102 (4th Cir. 2006) (explaining that an agency action is "arbitrary and capricious if the agency has relied on factors which Congress had not intended it to consider") (citation omitted). The Department's regulations list six considerations for it to take into account when evaluating Mountain Valley's application. A related project's viability is not one of them. *See* 15A NCAC 2H.0506(b). The Department therefore acted arbitrarily and capriciously in basing its decision on factors other than those its regulations prescribe. *See, e.g.*, *North Carolina v. EPA*, 531 F.3d 896, 916-917, 929-930 (D.C. Cir. 2008) (per curiam) (dismissing agency action as "entirely arbitrary, since [the agency] based them on irrelevant factors"); *Bluestone Energy Design, Inc. v. FERC*, 74 F.3d 1288, 1295 (D.C. Cir. 1996) (concluding that FERC exceeded its authority to assess penalties by relying on a factor impermissible under its organic statute).

Even the Department's passing mentions of potential water-related impacts in its denial letter do not establish that the Southgate Project will not comply with state water-quality standards. The Department stated that the Southgate Project "has the potential to result in" certain water-quality impacts and that it might "risk

impacting high-quality waters and protected and critical drinking water supplies."
JA__ [Denial Letter 2].  But any project has the "potential" to impact state waters.
That is not the test, and mere potential is not grounds for denying an application.
Instead, the Department's regulations consider whether impacts will be of a degree
that it will violate state water-quality limitations, not whether it could impact state
waters at all.  15A NCAC 2H.0506(b).  That is, the Department must evaluate
whether the Southgate Project "*would* cause or contribute to a violation of water
quality standards" or whether the Southgate Project "*would* result in secondary or
cumulative impacts that cause or contribute to, or will cause or contribute to, a
violation of water quality standards."  *Id.* at 2H.0506(b)(2)-(3) (emphases added).
And here, the hearing officer found the Southgate Project would not.  JA__-__
[R&R 13-17].  So the mere possibility that the Southgate Project may have *some*
water-quality impacts—and few if any projects do not have that potential—was not
a permissible basis on which to deny Mountain Valley's application.

  The closest the Department came to invoking its regulations was its
statement that constructing the Southgate Project without a fully permitted and in-
service Mainline Project is "inconsistent with principles of minimization."  JA__
[Denial Letter 2].  But the Department's regulations mention minimization in a
particular context.  They require the agency to consider whether the project "has
avoided and minimized impacts to surface waters and wetlands to ensure any

remaining surface waters or wetlands, and any surface waters or wetlands downstream, *continue to support existing uses during and after project completion*." 15A NCAC 2H.0506(b)(1) (emphasis added). "Minimization," in other words, is not a free-floating obligation. It exists to ensure that surface waters and wetlands can be used for the same purposes they were before the project began. And here, the hearing officer explained that if the Southgate Project was carried out with planned and recommended mitigation activities, "the streams, buffers, and wetland impact areas will continue to support existing uses of hydrology, vegetation, and aquatic and wildlife habitat." JA__ [R&R 13]. He therefore concluded that the Southgate Project "ha[d] minimized impacts to surface waters and wetlands to the greatest extent practical." JA__ [*Id.* at 12]. Nothing in the Department's denial letter takes issue with that finding, and the Department never explained what "principles of minimization" led it to its contrary result.

The Department ultimately appears to have engaged in a freeform weighing exercise, believing that the Southgate Project's potential benefits do not outweigh its potential risks "without certainty of the project's utility upon completion." *See* JA__ [Denial Letter 2]. But the North Carolina Court of Appeals has already foreclosed that trade-off-focused approach. In *City of Rockingham v. North Carolina Department of Environment & Natural Resources*, 736 S.E.2d 764, 771 (N.C. Ct. App. 2012), the complaining parties contended that the Department

should have imposed more stringent conditions on a dam's Section 401 certification because doing so would benefit eco-tourism in the area, activities known as "secondary recreation uses."  The North Carolina Court of Appeals disagreed, explaining that, under the Department's regulations, a Section 401 certification need not "further enhance secondary recreation if it has been determined that the Certification will not adversely impact the existing secondary recreation uses." *Id.*  In other words, the added benefits that would flow from a stricter certification "are not factors in issuing the Certification." *Id.*

The Department's rationale for denying the Southgate Project a Section 401 certification is essentially the same one *City of Rockingham* rejected.  The Department believes the Southgate Project's environmental impacts outweigh the Project's projected utility.  *See* JA__-__ [Denial Letter 1-2].  But like in *City of Rockingham*, once the Department has determined that the Southgate Project will satisfy North Carolina's water-quality standards, the theoretical trade-off between the Project's potential environmental risks and projected utility is "not [a] factor[ ] in issuing the Certification."  736 S.E.2d at 771.

At bottom, the Department arrogated to itself a policy role that its regulations do not contemplate and denied Mountain Valley's application under an extra-regulatory, unsupported finding of unviability.  That requires vacatur of the Department's denial.  It is, after all, "axiomatic . . . that an agency is bound by its

own regulations," and that "an agency action may be set aside as arbitrary and capricious if the agency fails to comply with" them. *National Envtl. Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (internal quotation marks and citations omitted). The Department's failure to follow its own regulations requires its denial be set aside.

## II. THE DEPARTMENT EXCEEDED ITS LIMITED JURISDICTION UNDER THE CLEAN WATER ACT.

The Department did not only flout its own regulations. It also exceeded its statutory authority. FERC has exclusive jurisdiction to determine a pipeline project's viability and public need, while Section 401 gives States limited power to determine a project's compliance with applicable water-quality standards. Yet the Department strayed out of its lane and into FERC's, basing its decision on what it believed was the likelihood of the Mainline Project receiving a distinct set of environmental permits from other regulators. That, too, is unlawful. *See Chamber of Commerce v. NLRB*, 721 F.3d 152, 154 (4th Cir. 2013) (an agency that exceeds its statutory authority has acted arbitrarily and capriciously).

Under the Natural Gas Act and Clean Water Act, the federal and state governments each have critical roles to play when regulating proposed construction projects that may result in discharges into navigable waters subject to Section 401's certification requirement. But their roles are not the same. For example, FERC is tasked with balancing a natural gas pipeline project's economic

benefits and potential adverse impacts.  *See, e.g.*, 15 U.S.C § 717n(b)(1)

(designating FERC "as the lead agency for the purposes of coordinating all

applicable Federal authorizations and for the purposes of complying with

[NEPA]").

Section 401 reserves a distinct, narrower role for States.  Congress directed

that reviewing State agencies base their permitting decisions on certain federally

prescribed water-quality standards, *see* 33 U.S.C. § 1341(a)(1) (requiring State

certification of compliance "with the applicable provisions of sections 1311, 1312,

1313, 1316, and 1317 of this title"), as well as "other appropriate requirement[s] of

State law."  *Id.* § 1341(d); *S.D. Warren Co. v. Maine Bd. of Envtl. Prot.*, 547 U.S.

370, 386 (2006) ("State certifications under § 401 are essential in the scheme to

preserve state authority to address the broad range of pollution . . . .").  Section 401

thus "serves as the conduit for the incorporation of relevant State water quality

standards in this otherwise Federally filled universe."  *Niagara Mohawk Power

Corp. v. New York State Dep't of Envtl. Conservation*, 624 N.E.2d 146, 149 (N.Y.

1993).  States are afforded a prime—but limited—role in the federal permitting

process:  reviewing potential projects for compliance with covered water-quality

standards.  Put differently, outside of verifying a project's compliance with state

water-quality standards, Section 401 does not allow States to second guess a

project FERC has found to be in the public convenience and necessity.

Nor is States' authority over water quality "unbounded." *PUD No. 1 of Jefferson Cty. v. Washington Dep't of Ecology*, 511 U.S. 700, 712 (1994). Because enterprising regulators may lay claim to a broader set of powers under the guise of ensuring water quality, courts must enforce the lines Congress has drawn to properly cabin the scope of States' Section 401 review. The Supreme Court has not yet definitively resolved what water-quality standards, beyond those specifically enumerated elsewhere in Section 401, "are also permitted by § 401(d)'s reference to 'any other appropriate requirement of State law.' " *Id.* at 713; *see also id.* ("We do not speculate on what additional state laws, if any, might be incorporated by this language."). But "Section 401(d), reasonably read in light of its purpose, restricts conditions that states can impose to those affecting water quality in one manner or another." *American Rivers, Inc. v. FERC*, 129 F.3d 99, 107 (2d Cir. 1997). That means that, at a minimum, a State's permitting determination must bear more than a tangential relationship to water quality.

And courts have properly rejected state regulatory overreach under Section 401 when it occurs. For example, Michigan's Department of Natural Resources was held to have exceeded its Section 401 authority over water quality when it sought to order a power company to conduct "an exploratory study regarding the number of fish killed" when the regulators "did not know or did not express what level of fish kill was acceptable or what type of protective measures were

necessary to maintain the proper 'use' of the particular river for particular species of fish." *Commonwealth Power Co. v. Department of Nat. Res.*, No. 204399, 2000 WL 33521869, at *2 (Mich. Ct. App. Mar. 21, 2000) (per curiam). The Connecticut Department of Environmental Protection similarly exceeded its Section 401 authority by denying a water-quality certification "based on the aesthetics of viewing the site." *Summit Hydropower v. Commissioner of Envtl. Prot.*, No. CV91050 26 43, 1992 WL 175241, at *12 (Conn. Super. Ct. July 20, 1992), *rev'd on other grounds*, 629 A.2d 367 (Conn. 1993). As these cases confirm, States must base their Section 401 permitting decisions on particular projects' anticipated water-quality impacts; pursuing other policy goals in the generalized name of advancing water quality will not cut it.

The Department's denial of Mountain Valley's application for the Southgate Project is a classic example of this sort of regulatory overreach. The Department's stated rationale for denial was the "uncertainty of the MVP Mainline project's completion," which "presents a critical risk to the achievability of the fundamental purpose of MVP Southgate." JA__ [Denial Letter 2]. The Department expressed concern that "several federal permits" needed to construct the Mainline Project have either been "suspended or are pending," including "some in litigation." *Id.* Because the Southgate Project "is tied to and wholly relies on" the Mainline

Project, the Department denied certification "without further confidence that" the former "can achieve its stated purpose." *Id.*

That concern bears no relation to the water-quality standards that the Department is tasked with and limited to overseeing. Whether the Mainline Project permits should ultimately be granted is a question reserved for other regulatory bodies. And whether the Southgate Project is feasible or necessary in light of the Mainline Project is a question for FERC. *See* JA__ [FERC Order P 87] (explaining that "[t]he public interest determination, including market need, for the pipeline lies with the Commission"). By focusing its decision on broader, cross-project considerations, the Department overstepped its limited authority "to assure compliance with state water quality standards" as to the Southgate Project. *PUD No. 1 of Jefferson Cty.*, 511 U.S. at 713.

Just as the Department's allusion to the Southgate Project's "potential" for "adverse environmental impacts" did not bring it within its regulatory authority, *supra* pp. 27-28, those same vague statements do not bring the Department's decision within its statutory authority, either. Rather than address the particulars of the Southgate Project proposal and the resulting effects on water quality, the Department points generally to the "potential" for "adverse environmental impacts" by citing FERC's EIS and asserting that "the project would unnecessarily risk impacting high-quality waters" and "drinking water supplies." JA__ [Denial

Ltr. 2].  Nowhere, however, does the Department engage with the specifics of these "potential" concerns.  Indeed, the Department does not cite—much less analyze—any specific North Carolina water-quality standard the Southgate Project might violate.  *See supra* pp. 25-30.

In essence, the Department is simply asserting that denying a Section 401 certification will ensure that *any* potential water-quality impacts—of whatever sort and regardless of their scope—do not come to pass for a project whose overall fate is even remotely uncertain.  And denial is necessary, under the Department's theory, even if it is possible to make approval of the Section 401 certification contingent on resolving the uncertainty.  But if this Court were to hold that merely invoking water quality in this sort of hypothetical, second-order reasoning were within a State's Section 401 authority, then *any* water-quality certificate could be denied whenever there is at least one other permit pending.  After all, State regulators will always be able to claim that denying a Section 401 certification—and forbidding the project from being built—will eliminate all potential water-quality impacts.  Crediting the Department's denial as an "appropriate requirement" of North Carolina law under Section 401 would grant an uncheckable veto allowing state regulators, in their sole discretion, to substantially delay or block disfavored projects going forward.  That is precisely the sort of choke point that Congress acted against in allocating responsibilities under the Natural Gas Act

as it did. *Islander E. Pipeline Co. v. Connecticut Dep't of Envtl. Prot.*, 482 F.3d 79, 85 (2d Cir. 2006). This Court should reject the Department's attempt to reject the Southgate Project on non-water-quality grounds.

## III. THE DEPARTMENT DID NOT EXPLAIN ITS DISAGREEMENT WITH ITS HEARING OFFICER'S CONCLUSIONS, CONSIDER THE EVIDENCE SHOWING THE MAINLINE PROJECT WAS VIABLE, OR EXPLAIN WHY A CONDITIONALLY APPROVED PERMIT WOULD NOT ADDRESS ITS CONCERNS.

Finally, even if the Department's approach to Mountain Valley's certification request conformed to the Department's regulations and the Clean Water Act—and it did not—the Department's denial letter is not the product of "reasoned decisionmaking." *Roe v. U.S. Dep't of Defense*, 947 F.3d 207, 220 (4th Cir. 2020) (quoting *Judulang v. Holder*, 565 U.S. 42, 53 (2011)). Although an agency decision can be upheld if it is "of less than ideal clarity," the "agency's path" must still be "reasonably . . . discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974). Here, it cannot.

For starters, the Department's letter does not reconcile its denial with its hearing officer's contrary findings. *See* JA__-__ [Denial Letter]. The Department did not consider the evidence demonstrating that the Mainline Project's perceived problems were on track to being remedied. And the Department did and does not explain why it chose denial over the obvious alternative of an approval conditioned on the Mainline Project receiving all necessary authorizations. *See id.*

36

Start with the hearing officer's report.  *See* JA__-__ [R&R].  The hearing

officer worked through the relevant specified criteria and concluded that the

Southgate Project met North Carolina's water-quality standards.  *Id.*  He found that

Mountain Valley had "minimized impacts to surface waters and wetlands to the

greatest extent practical."  JA__ [R&R 12].  He found that the Southgate Project

"is not expected to violate water quality standards if the certification is issued and

if the conditions in the 401 Water Quality Certification are fully complied with by

the applicant."  JA__ [*Id.* at 16].  He found that the Southgate Project "is not

expected to result in cumulative impacts that violate water quality standards, if the

conditions [in the certification] are fully implemented."  JA__ [*Id.* at 17].  And he

found that "[n]o mitigation is required for stream or wetland impacts as a result of"

the Southgate Project.  JA__ [*Id.* at 18].

The Department never explained why it reached a different result or why it

disagreed with its hearing officer.  JA__-__ [Denial Letter].  Indeed, it never even

acknowledged the hearing officer's findings in any detail.  *Id.*  And the

Department's failure to do so was arbitrary and capricious.  As this Court has

explained in the Social Security context, although the Social Security

Administration may disagree with a disability finding made by another agency, it

must "adequately explain why" it did.  *Woods v. Berryhill*, 888 F.3d 686, 694 (4th

Cir. 2018); *see also McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002)

(Social Security Administration may disagree with Veterans Administration disability determination if it gives "persuasive, specific, valid reasons for doing so that are supported by the record").  As the D.C. Circuit similarly has held, an agency may disagree with its administrative law judges' findings, but it must "explain the basis of its disagreement."  *Arc Bridges, Inc. v. NLRB*, 861 F.3d 193, 200 (D.C. Cir. 2017) (quoting *Fort Dearborn Co. v. NLRB*, 827 F.3d 1067, 1073 (D.C. Cir. 2016)).  The administrative-law principle behind both lines of cases is the same:  When an agency disagrees with the considered views of another fact-finder, it must give a reason for the disagreement.  And here, the Department's failure to acknowledge or address its hearing officer's report and recommendation renders its ultimate denial arbitrary and capricious.

The Department's refusal to address its hearing officer's findings also violates its duty to show that it "examined the relevant data and provided an explanation of its decision that includes a rational connection between the facts found and the choice made."  *Appalachian Voices*, 912 F.3d at 753 (quoting *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009)).  The hearing officer analyzed the whole record and concluded that the Southgate Project, as mitigated, meets all applicable water-quality standards.  JA__-__ [R&R].  The Department analyzed a subset of the record and concluded that the Southgate Project, even as mitigated, could not move forward.  JA__-__ [Denial

Letter].  Without reconciling those views, the Court can have no certainty that the Department's view of the record is the correct one.  *See Alvarez Lagos v. Barr*, 927 F.3d 236, 251 (4th Cir. 2019) (finding an agency action arbitrary that "failed to appreciate, or even address, critical evidence in the record") (citation omitted); *Fred Meyer Stores, Inc. v. NLRB*, 865 F.3d 630, 638 (D.C. Cir. 2017) (explaining that an agency must "reasonably reflect upon the information contained in the record and grapple with contrary evidence").

The Department also never engaged with the record demonstrating that the Mainline Project is viable.  The Department noted that "several federal permits necessary for the construction of the [Mainline Project] project have been suspended or are pending, with some in litigation."  JA__ [Denial Letter 2].  But the Department never addressed Mountain Valley's extensive chart showing that the permits were in the process of being issued or reissued.  JA__-__ [June 2020 RAI Response 4-10].  Nor did the Department address Mountain Valley's representation that it was "working diligently with the Federal agencies and fully expect[ed] to resolve all Mainline permitting issues in a timeframe that [was] not expected to materially delay the planned commencement of construction for" the Southgate Project.  JA__ [*Id.* at 3].  And as it turned out, Mountain Valley was right; FERC lifted the Mainline Project's stop-work order in part shortly after the Department's denial letter.  *Supra* p. 18.  In short, the Department never addressed

Mountain Valley's demonstration that the Mainline Project *was* viable, and was viable on a timeline that made denial of Mountain Valley's Section 401 application improper. The Department's "failure to respond to contrary arguments resting on solid data, epitomizes arbitrary and capricious decisionmaking." *Illinois Pub. Telecomms. Ass'n v. FCC*, 117 F.3d 555, 564 (D.C. Cir. 1997) (per curiam).

Finally, the Department never explained why it chose to deny the Southgate Project a Section 401 certification rather than conditioning the certification on the Mainline Project receiving all necessary approvals to re-commence construction— just as FERC had. As the hearing officer recognized, a conditioned permit "solves" the supposed problem "of an incomplete or unfinished project"—the Mainline Project—"causing unnecessary impacts to North Carolina resources." JA__ [R&R 12]. Yet the Department's denial letter does not acknowledge the possibility of a conditional certification or explain why the Department chose to deny certification outright, rather than granting a conditional one.

That, too, flunks black-letter administrative law. The Department "must cogently explain why it . . . exercised its discretion in a given manner." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48-49 (1983). That means the Department must sufficiently explain its reasons for making its choices so that the Court "can discern reasoned decision-making from the record." *United States Sugar Corp. v. EPA*, 830 F.3d 579, 653 (D.C. Cir.

2016) (per curiam).  Here, the Department did not even admit that a conditioned

permit was an option.  And given that FERC went that route in issuing the

Southgate Project's certificate of convenience and public necessity, the

Department's failure to discuss the conditioned-approval option is all the more

baffling.  JA__-__ [FERC Order PP 5-9].  Because the Department did not give

any reasons for rejecting an approval with conditions, its denial should be vacated.

## CONCLUSION

For the foregoing reasons, the Department's denial of Mountain Valley's

Section 401 certification application should be vacated.

Respectfully submitted,

/s/ Catherine E. Stetson
Catherine E. Stetson
Sean Marotta
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, D.C. 20004
Phone: (202) 637-5491
Fax: (202) 637-5910
cate.stetson@hoganlovells.com

*Counsel for Mountain Valley Pipeline, LLC*

Dated:  November 16, 2020

# CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limits of Fed. R. App. P. 32(a)(7) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 9,030 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman.


/s/ Catherine E. Stetson
Catherine E. Stetson

**CERTIFICATE OF SERVICE**

I certify that on November 16, 2020, the foregoing was electronically filed through this Court's CM/ECF system, which will send a notice of filing to all registered users.

/s/ Catherine E. Stetson
Catherine E. Stetson